**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA,** | : | |
| | : | **Case No. 1:06cr424** |
| **Plaintiff,** | : | |
| | : | **JUDGE KATHLEEN O'MALLEY** |
| **v.** | : | |
| | : | |
| **ROBERT WILLIAMS,** | : | **MEMORANDUM AND OPINION** |
| | : | |
| **Defendant.** | : | |

**I.      INTRODUCTION.**

        On November 7, 2006, Defendant Robert Williams ("Defendant" or "Williams") pleaded guilty to both counts of a two-count indictment for unlawful possession of an unregistered firearm in violation of 26 U.S.C. § 5861(d) and transfer of an unregistered firearm in violation of 26 U.S.C. § 5861(e).  The parties agree that Defendant's criminal history is category I.

        The parties submitted sentencing memoranda in January 2007.  The Court held an extensive sentencing hearing on January 12, 2007.  After the hearing, the parties were permitted to submit supplemental sentencing memoranda addressing whether Defendant's conduct warranted an increased Offense Level under the United States Sentencing Guidelines ("USSG" or "Sentencing Guidelines").  On February 13, 2007, the Court reconvened the sentencing hearing for several more hours of testimony and argument.  The Court has since reexamined the transcripts and evidence, and the issues are ripe for its determination.

Appropriate sentencing methodology involves a three-level analysis: (1) applying the Guidelines; (2) considering any proposed departures under the Guidelines; and (3) considering whether the resulting sentence range presents the Court with appropriate sentencing options, given the sentencing factors enumerated in 18 U.S.C. § 3553(a), or whether some other sentence represents that which is no more than reasonably necessary to address all of those factors. See, e.g., United States v. McBride, 434 F.3d 470, 471 (6th Cir.2006) (because Guideline "departures" are a part of the appropriate Guideline range calculation they are still a relevant consideration for determining the appropriate Guideline sentence). As discussed below, the Court's analysis of steps two and three in this sentencing process ("departures" and "variances") will be explained during the Defendant's final sentencing hearing. This Opinion only addresses whether the Court finds, by a preponderance of the evidence, that Williams "used or possessed [the] firearm . . . in connection with the commission or attempted commission of another offense, or possessed or transferred a firearm . . . with knowledge or intent that it would be used or possessed in connection with another offense," such that the Guidelines counsel a longer term of incarceration. The relevant "offense" at issue here is the Defendant's alleged conspiracy to murder his father-in-law.

## II.    BACKGROUND.

The events leading to Williams's November 7, 2006 guilty plea to both possessing and transferring an illegal, sawed-off shotgun in violation of 18 U.S.C. §§5861(a) and (e) are of critical importance to the Court's determination of the applicable offense level under the advisory Sentencing Guidelines. The following discussion represents the Court's findings of fact in relation to those events.

Defendant Williams at one time owned and operated a lawn-mower repair shop in rural Ohio.

2

While operating the store, Williams became acquainted with a man who, unbeknownst to Williams, operated as a confidential, government informant (the "informant" or "CI") during the course of the events described below.  According Williams's wife, Williams was acquainted with the informant for approximately five years prior to those events.  It is undisputed that the CI has a long criminal history, and that Williams's wife believed him to be violent, dangerous, and unstable.  Indeed, Mrs. Williams testified that, in June 2006, she and Mr. Williams each filed police reports complaining that the CI had threatened her and her family.  Mrs. Williams further testified that the informant was incarcerated as a result of the 2006 police report.  It is clear to the Court, therefore, that the informant was perceived by both Williams and his family to be violent and dangerous.[1]  Given the nature of the alleged other "offense" (conspiracy to commit murder), the Defendant's perception of the CI's willingness to commit violent crimes is particularly relevant.  It is against this backdrop that the Court has considered the following series of events.

On approximately August 14, 2006, the informant met with Special Agent Sullivan ("Agent Sullivan") of the Federal Bureau of Investigation ("FBI") to discuss Williams.  The informant told Agent Sullivan that Williams claimed he could steal weapons, through various accomplices, from a United States military base.  As a result, Agent Sullivan decided to investigate the matter further, and provided the informant with various audio and video recording devices to record conversations with Williams.[2]  During the sentencing hearings, the government introduced several audio and video

---

[1] Mrs. Williams testified that she believed the informant would kill her father-in-law, though she stated in court (contrary to her earlier out-of-court expressions of concern for her family's safety) that she did not believe Williams would do so.

[2] Though largely irrelevant to the issue *sub judice*, Williams indeed spoke with the informant about illegally procuring M-16 semi-automatic rifles, grenades, and explosives through Williams's purported sources within the United States military.  There is no evidence that this

recordings of conversations between Williams and the CI.  The Court's findings also are based, in part, upon its assessment of these audio and video recordings.

On August 21, 2006, the informant was invited to Williams's home to discuss a "big" matter with respect to which Williams said he needed the informant's help.  The CI arrived at the August 21, 2006 meeting equipped by the FBI to record sound and video.  During that meeting, Williams told the informant that he wanted him to kill his father-in-law in response to an earlier insult.  The Court finds that, contrary to Defendant's assertions, the request was much more than an expression of bravado.  Rather, over the course of an extensive meeting, Williams and the CI had a detailed discussion about precisely how the CI should carry out the murder-for-hire.  The initial plan, as described by Williams and captured on video, was for the informant to wait in a wooded area near where Williams and his father-in-law were supposed to meet to fight.  The informant then was to come out of the wooded area when Williams's father-in-law arrived and shoot him twice in the head with a shotgun.  After discussing the manner in which the murder-for-hire would be carried out, the video surveillance showed Williams instructing his minor child (who was privy to much of the discussion) to go upstairs to retrieve the keys to Williams's locked gun cabinet.  Upon receiving the keys, Williams opened the cabinet and showed the informant the shotgun (referred to as "Little Johnny")[3] and the ammunition that the informant was to use to murder his father-in-law.  Williams, however, kept the shotgun that night, claiming that he needed to repair it.

On the morning of August 22, 2006, the informant communicated the events of the previous

transaction proceeded past the initial discussion.

[3] It is undisputed that this is the same illegal, sawed-off shotgun that serves as the basis for Williams's guilty plea.  Thus, the "in connection with" requirement found in USSG 2k2.1(c) is satisfied.

night to Agent Sullivan.  The informant also told Agent Sullivan that he was to return to Williams's home later that day to finalize the plans.  The informant telephoned Williams sometime during August 22, 2006 to confirm that he was to murder Williams's father-in-law.  On the recording Williams said they were "still on for tonight," and told the informant that he would have to get the victim "set up" and "do the calling" because the victim would recognize Williams's voice.  The plan, therefore, was for the informant to lure the victim to the ambush site.  To that end, Williams provided the informant with the father-in-law's telephone number.  Later that day, Agent Sullivan followed the informant to Williams's home and surveilled him while he met with Williams therein.  After the informant left Williams's home, he returned to Agent Sullivan and presented him with the sawed-off shotgun and two .16 gauge shotgun shells.  Williams has never denied giving the shotgun to the informant.  That same day, an FBI agent contacted the father-in-law's family to warn them not to respond to any telephone calls.

On August 24, 2006, Williams met with the informant again, this time at the informant's residence.  At that meeting, Williams told the informant that he wanted the shotgun back because he had to take care of something.  Also during the conversation, Williams told the informant that, during the previous night, his wife told him she was going to divorce him.  Williams said that he needed the shotgun returned so that he could murder his wife, his mother-in-law, and his father-in-law after his son went to sleep.  Williams also told the informant that, after he carried out the crime, he intended to flee Ohio to property he owned in Pennsylvania.  The informant eventually agreed to meet to return the shotgun to Williams.  Instead, FBI agents met Williams at the intended rendezvous and arrested him.  The murders were never carried out.

III.      APPLICATION OF THE SENTENCING GUIDELINES.

5

**A.      2K2.1  Unlawful Receipt, Possession, or Transportation of Firearms.**

On November 7, 2006, Williams pleaded guilty to possessing a firearm that was not registered in the National Firearms Registration and Transfer Record in violation of 26 U.S.C. § 5861(d), and transferring an unregistered firearm in violation of 26 U.S.C. § 5861(e).  Neither party disputes that an analysis of the recommended sentence under the Guidelines begins with section 2K2.1(a)(5), which addresses certain prohibited transactions involving firearms or ammunition.

Section 2K2.1(a)(5) recommends a Base Offense Level of eighteen when, as here, the underlying offense involved a firearm described in 26 U.S.C. § 5845(a).  The definition of firearm in 26 U.S.C. § 5845(a) includes "a shotgun having a barrel or barrels of less than eighteen inches in length."  It is undisputed that "Little Johnny," the weapon transferred by Williams"(a Winchester "Model 37" sixteen-gauge shotgun with a twelve-inch barrel), fits within this definition.[4]  The analysis under the Guidelines, however, does not end with this determination.

The government argues that it has also shown that Williams transferred the illegal firearm to the CI as part of the solicitation of, or conspiracy to commit, the murder of his father-in-law as discussed above.  Accordingly, the government submits that the cross-reference in section 2K2.1(c)(1) of the Sentencing Guidelines recommends applying a higher Base Offense Level because, "[w]hen a defendant use[s] the firearm in connection with the commission or attempted commission of another offense, the applicable guideline for [the] offense permits cross-reference to the attempt guideline 'in respect to that other offense,'"  United States v. Curry, 111 F.3d 132 (Table), 1997 WL 178885, at *3-*4 (6th Cir. 1997).  The cross-reference in section 2K2.1(c) is not

---

[4] The video surveillance shows Williams refer to "Little Johnny" and state that it is an illegal firearm because it does not have a barrel in excess of eighteen inches.

6

limited to the offense that was charged in the indictment or that resulted in a conviction. Id. (internal quotations and citations omitted) (observing that the Sixth Circuit "has recognized, increases are possible, under the guidelines, not only where the other crime is uncharged, but where the other crime does not even come within the jurisdiction of the federal courts.").

Section 2K2.1(c)(1)(A) counsels a Court to apply section 2X1.1 (for attempt, solicitation, or conspiracy) if the resulting offense level would be higher than an eighteen.  Under section 2X1.1(c)(1), because conspiracy to commit murder is expressly covered by another guideline, the Court is referred to section 2A1.5(a), which specifically addresses conspiracy or solicitation to commit murder.  Thus, should the Court find that the government has proved by a preponderance of the evidence that Williams transferred the firearm in connection with the solicitation of, or conspiracy to commit, the murder of his father-in-law, section 2A1.5(a) would set Williams's recommended Base Offense Level at thirty-three.[5]

### B.  Williams Transferred the Firearm In Connection With a Conspiracy to Commit Murder.

To justify an increase in the recommended sentence under the Guidelines, the government must prove the relevant facts by a preponderance of the evidence.  United States v. Cook, No 05-2731, 2007 WL 930212, at *2-*3 (6th Cir. Mar. 26, 2007).  As noted above, "the sentencing guidelines do not restrict § 2K2.1(c), the cross-reference provision, to offenses that were charged in the indictment."  United States v. Cowan, 196 F.3d 646, 649 (6th Cir. 1999) (citations omitted).

---

[5] Section 2A1.5(b)(1) also recommends increasing Williams's Base Offense Level to thirty-seven "if the offense involved the offer or the receipt of anything of pecuniary value for undertaking the murder."  Though the criminal complaint suggests that Williams agreed to give the CI $2,000 in weapons to undertake the murder, the government did not present significant evidence of this issue during the sentencing hearing, so the Court declines to apply the four-level enhancement.

Though not charged in the indictment, the relevant crime under Ohio law is conspiracy to commit murder which criminalizes the following conduct:

> (A) No person, with purpose to commit or to promote or facilitate the commission of aggravated murder, murder, . . . shall do either of the following:
>
>> (1) With another person or persons, plan or aid in planning the commission of any of the specified offenses;
>>
>> (2) Agree with another person or persons that one or more of them will engage in conduct that facilitates the commission of any of the specified offenses.

Ohio Rev. Code § 2923.03.[6]  In this case, therefore, the government must prove the elements of conspiracy to commit murder under Ohio law by a preponderance of the evidence.

### 1.    The Government Has Shown By a Preponderance of the Evidence That Under Ohio Law Williams Conspired to Commit Murder.

Ohio punishes an offender for murder when that person: "purposely cause[s] the death of

---

[6] Solicitation of murder is contemplated by the Ohio statute addressing complicity.  See Ohio Rev. Code § 2923.03(A)(1) ("No person, acting with the kind of culpability required for the commission of an offense, shall do any of the following:  (1) Solicit or procure another to commit the offense; . . .").  Ohio law punishes an individual who is complicit in the commission of an offense as if he or she were a principal offender.  Ohio Rev. Code § 2923.03(F).  Ohio Revised Code section 2923.03(C), however, states that no person, "shall be convicted of complicity under this section unless an offense is actually committed, but a person may be convicted of complicity in an *attempt* to commit an offense in violation of section 2923.02 of the Revised Code."  Accordingly, if he were charged under Ohio law, Williams might have been charged with complicity in the *attempted* murder of his father-in-law, and punished as a principal offender in the attempt crime.  The relevant prohibition for attempted murder in Ohio states: "[n]o person, purposely or knowingly, and when purpose or knowledge is sufficient culpability for the commission of an offense, shall engage in conduct that, if successful, would constitute or result in the offense."  Ohio Rev. Code § 2923.02.  The Court observes that the Guidelines recommend a Base Offense Level of 33 for both attempted murder and conspiracy or solicitation to commit murder when the victim is uninjured.  See U.S.S.G. §§ 2A1.5(a); 2A2.1(a)(1).  Thus, because the crime did not result in a murder (or an injury), both solicitation (complicity) and conspiracy would yield the same sentencing recommendation under the Guidelines.

8

another;" where "purposely" is the "specific intention to cause a certain result." See Ohio Rev. Code §§ 2903.02 (murder), 2901.22 (culpable mental states).  The government, therefore, must show that Williams planned, aided in the planning, or engaged in conduct that facilitated *purposely* causing the death of his father-in-law.  In addition, the government must show that Williams committed "a substantial overt act in furtherance of the conspiracy . . .  subsequent to [his] entrance into the conspiracy." See Ohio Rev. Code 2923.01(B). "[A]n overt act is substantial when it is of a character that manifests a purpose on the part of the actor that the object of the conspiracy should be completed." Id.  Williams, however, may be found guilty of conspiracy to commit murder if he planned to purposely cause the death of his father-in-law, even if the murder never actually was carried out.  See Ohio Rev. Code 2923.01(E).

Williams argues that the government has not proven the elements of conspiracy because: (1) he lacked the requisite intent to commit murder; (2) there was no substantial overt act in furtherance of the crime; and (3) he subsequently took actions seeking to thwart the plan.  For the reasons discussed below, the Court is not persuaded by Williams's arguments.

### a.      Williams and the CI Planned the Murder of His Father-In-Law.

Williams's contention that he did not possess the requisite level of intent to conspire to commit the murder of his father-in-law is plainly at odds with the facts.  Williams asserts that the planning and threats made during the August 21, 2006 meeting were the "product of hurt feelings, emotions and alcohol" and "merely the ramblings of a drunk and hurt man."  (Def's Supp. Sentencing Mem. at 4.)  The Court's review of the evidence, however, does not support this theory.

As an initial matter, the Defendant did not appear to be drunk or incapacitated during the August 21, 2006 meeting.  Contrary to Williams's position, moreover, the video tape did not show

9

that the CI brought over a case of beer and got him drunk prior to the conversation.  Instead, the surveillance video revealed the CI asking Williams if he could take a beer from his refrigerator, and showed a lucid Williams asking the CI to bring him one too.

Furthermore, the government's evidence is not based on a single, emotional outburst from Williams.  Instead, the surveillance evidence showed that Williams discussed the murder numerous times over the course of several days.  First, the Court notes that the meeting on August 21 was set up earlier, in a phone call placed by Williams himself, where he pointedly told the CI that he needed the CI to take care of something "big" for him.  Discussion of the murder was, thus, not something Williams conjured up on the spur of the moment; the meeting with the CI was planned for the precise purpose of having that discussion.  No evidence suggests, moreover, that Williams was intoxicated or incensed on August 22, the day *after* the planning session, when he was recorded again referring to the murder-for-hire, or again later that day when the CI retrieved the firearm (which Williams supposedly repaired in the interim for the purpose of committing the crime).  The subsequent video surveillance tapes, also, do not reveal an obviously intoxicated or notably agitated Williams on August 24 when he requested that the informant return the firearm so that he personally could murder his father-in-law, mother-in-law, and wife.  In fact, Williams is remarkably, indeed eerily, calm during the series of events.

As described above, the government has shown a number of facts that prove to this Court by a preponderance of the evidence that Williams engaged in substantial planning specifically designed to purposely cause the death of his father-in-law.  In sum, to recapitulate the government's evidence briefly, it has shown: (1) the murder-for-hire was discussed at length, and several times; (2) a weapon and an ambush site were chosen; (3) a ruse was constructed to lure the victim to the ambush

10

site; (4) Williams provided the CI with the father-in-law's telephone number to aid in setting up the ambush; (5) Williams instructed the CI to murder his father-in-law with a shotgun; and, most importantly; (6) that Williams provided the CI – whom he knew or believed to be a felon with a propensity for violence – with a firearm that has no legitimate purpose other than murder.[7] Williams's bald assertions that the repeated discussions and acts taken in furtherance of the murder were simply the empty bravado of a "drunk and hurt man" simply were not borne out by the evidence produced during the sentencing hearings. Accordingly, the Court finds that the government has shown that Williams conspired with the CI to commit the murder of his father-in-law.

### b. Williams's Transfer of the Firearm Was A Substantial Overt Act in Furtherance of the Conspiracy.

Ohio courts have found that setting up a meeting with a hit man and providing a weapon to a co-conspirator are both substantial overt acts in furtherance of a conspiracy to commit murder. See, e.g., State v. Hines, No 9-05-13, 2005 WL 3455130 (Ohio App. Dec. 19, 2005); State v. Andrejic, No. 79700, 2002 WL 538762 (Ohio App. Apr. 11, 2002); State v. Dapice, 566 N.E.2d 1261, 1267 (Ohio App. 1989). By August 22, 2006, after planning the murder of his father-in-law and providing the CI with the firearm, therefore, Williams's had satisfied the elements of conspiracy to commit murder. If the CI truly had been in the murder-for-hire business, the Court believes that the matter would have ended very differently.

It is no defense to conspiracy that no person with whom the accused conspired has been convicted as a principal offender. Ohio Rev. Code § 2923.01(D). Rather, a person is guilty of

---

[7] See United States v. McCarty, 475 F.3d 39, 47-48 (1st Cir. 2007) (citations omitted) ("courts have found that sawed-off shotguns, . . . 'lack usefulness except for violent and criminal purposes.'")

11

conspiracy "when with purpose to commit, promote, or facilitate the . . . the offense[] . . . he plans the commission of the crime with another and does a substantial overt act in furtherance of the conspiracy, even though the other person feigns agreement and at no time intends to go through with the plan." State v. Marian, 405 N.E.2d 267, 271 (Ohio 1980); see also State v. Fitzgerald, No. 23072, 2007 WL 518378, at *6 (9th Dist Ct. App. Feb 21, 2007) ("A conspiracy may be 'unilateral,' that is, one party who plans the underlying crime may still be guilty of conspiracy even if the other party does not act with the requisite culpable mental state but merely feigns agreement.").

Williams's argues that there is no independent verification of what occurred during the transfer of the firearm. The conversations between Williams and the CI the day before the transfer, the day of the transfer, and after the transfer, however, center on the murder of Williams's father-in-law and the use of the shotgun as the instrumentality of the crime. Williams has not offered any other explanation for the transfer of the shotgun. The Court finds that the government has proven, by a preponderance of the evidence, that Williams transferred the shotgun in furtherance of a conspiracy to commit murder, and not for another, non-criminal purpose which Williams has neither described nor suggested.

### 2. Williams Did Not Abandon the Conspiracy.

Having found that the government has satisfied its burden in proving by a preponderance of the evidence that Williams conspired to murder his father-in-law, the Court turns to whether any affirmative defenses would negate the offense. Under Ohio law, it is an affirmative defense to a charge of conspiracy when: "[a]fter conspiring to commit an offense, the actor abandoned the conspiracy prior to the commission of or attempt to commit any offense that was the object of the conspiracy . . . by advising all other conspirators of the actor's abandonment, . . . ." Ohio Rev. Code

12

§ 2923.01(I)(2).  Williams argues that when he met with the CI on August 24, 2007 to ask for the shotgun back so that he could kill his wife and her parents himself, he "abandoned" the conspiracy as contemplated by the statute.  Williams's interpretation of the events, however, is unpersuasive.

Simply put, Williams's actions were not the abandonment of a conspiracy contemplated by Ohio law.  Williams's statements only demonstrate a change in plans, they do not show an abandonment of the conspiracy.  See State v. Laster, No. 2000-L-013, 2001 WL 314644 (Ohio App. Mar. 30, 2001).  At no time does Williams tell the CI that he no longer wishes to have his father-in-law murdered.[8]  On the contrary, upon hearing that his wife wanted to divorce him, Williams requested that the CI return the shotgun so that he could personally carry out the murders of his wife and her family.  Both plans were discussed with the CI, both plans involved the murder of Williams's father-in-law, and both plans involved the use of the sawed-off shotgun.  The Court does not believe that simply adding to the list of victims, or changing the executioner, constitutes the abandonment of a conspiracy.[9]

In any event, even under Williams's preferred interpretation of the events, his actions during August 24, 2007 would represent a second, unabandoned conspiracy to commit murder.  The second conspiracy would simply involve the changed plan.  The planning or agreement phase of the

---

[8] Even Williams's minor child appears to understand that Williams is still planning to commit murder.  On the surveillance video during Williams's meeting with the CI to request the shotgun, he can be heard to say:  "[i]f you guys are going to do it tonight, I'm going to stay right here" because someone has told him, "he shouldn't watch."

[9] Further, as the government notes, Williams did not attempt to retrieve the shotgun for over forty-eight hours.  The government submits, and the Court agrees, that this substantial passage of time also militates against finding that Williams abandoned the conspiracy.  As discussed above, Williams had already concluded his role in the conspiracy long before requesting the return of the firearm.  The Court believes that the only thing that prevented the murder at that point was that Williams's accomplice was working with the FBI.

13

conspiracy had at least five important aspects:  (1) Williams arranged to meet with the CI; (2) Williams met with the CI and discussed his recent marital troubles; (3) Williams explained that he wanted to commit the murders himself; (4) Williams asked that the CI transfer the shotgun back; (5) Williams explained how he would evade capture by fleeing the state.  The substantial overt act in furtherance of the second conspiracy occurred when Williams drove to the rendezvous site to retrieve the weapon, but was arrested by the FBI.  The Court, therefore, finds that Williams did not prove by a preponderance of the evidence that he abandoned the conspiracy to commit murder.[10]

## IV.    CONCLUSION.

Williams's offense requires a sentence that will effectively deter and adequately reflect the seriousness of such egregious conduct, the need for just punishment, and the protection of the public. In this case, prior to any adjustment for acceptance of responsibility, the non-binding Sentencing Guidelines recommend a Base Offense Level of 33.  Williams's lack of criminal history points places him in criminal history category I.  Thus, prior to any adjustment for acceptance, downward departures, or variances, the guidelines recommend a sentence of 135-168 months.[11]  Violations of

---

[10] Williams's purported "abandonment" of the plan also would not provide him with an affirmative defense to a charge of complicity or attempt.  Williams's sentencing memorandum correctly states that an individual cannot be charged with complicity or attempt where he or she has abandoned the effort to commit the offense "under such circumstances manifesting a complete and voluntary renunciation of the actor's criminal purpose."  Williams's argument that the attempted retrieval of the weapon satisfies this standard, however, is disingenuous at best.  As discussed above, during the relevant exchange Williams clearly indicates that he needs the shotgun so that he can commit the murder himself.  This is a *reiteration* of Williams's criminal purpose, not the renunciation thereof.

[11] It has been suggested that the "offense characteristic" described in section 2K2.1(b)(6) and the "cross reference" found in 2K2.1(c) share similar elements.  The critical difference between the sections, as recognized by the Ninth Circuit, is that 2K2.1(b)(6) (which provides for a four-level increase in the base offense level) focuses on the use of a firearm in connection with a felony, whereas 2K2.1(c) (which refers a court to the guideline for the underlying offense)

26 U.S.C. §§ 5861(d) and (e), however, carry a maximum term of imprisonment of 10 years.  Thus, Williams cannot receive a sentence of greater than 120 months for each count.  The Court will discuss other adjustments to the guidelines, and make a final determination of Williams's sentence under 18 U.S.C. § 3553(a) on the record during his final sentencing hearing, which will occur on May 18, 2007 at 1:00 p.m.

       **IT IS SO ORDERED.**

                                    **s/Kathleen M. O'Malley**
                                    **KATHLEEN McDONALD O'MALLEY**
                                    **UNITED STATES DISTRICT JUDGE**

**Dated: May 3, 2007**

---

addresses the use of a firearm in connection with the *commission* of an offense.  See United States v. Myers, 112 F.3d 406, 409-11 (9th Cir. 1997).  Courts are counseled to hold an evidentiary hearing, as the Court has here, "to determine the nexus between [the] unlawful possession of firearms" and the connected offense.  Id. at 410.  As discussed, *infra*, the Court has found that Williams's transfer of the firearm was in connection with the commission of conspiracy to commit murder.  Indeed, the transfer of the firearm was the substantial act taken in furtherance of the conspiracy – the culmination of the *commission* of the crime.  Thus, because Williams's conduct has satisfied the closer, more specific nexus described in 2K2.1(c), it also necessarily satisfies the requirements of 2K2.1(b)(6).